**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 94-30587
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DONALD L. BECKNER,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Middle District of Louisiana
_____

November 20, 1995

Before REYNALDO G. GARZA, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendant Donald L. Beckner appeals his conviction for four counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of perjury, in violation of 18 U.S.C. § 1623. We reverse and remand.

I

Beckner was a prominent Baton Rouge attorney and a former United States Attorney for the Middle District of Louisiana. Sam Recile, a New Orleans real estate developer, retained Beckner to defend an injunctive action brought against Recile by the Securities and Exchange Commission. The SEC alleged that Recile

had engaged in securities fraud by issuing fraudulent mortgage notes in order to raise capital for the "Place Vendome" shopping mall project. In violation of a preliminary injunction, Recile continued to issue these mortgage notes during the pendency of the SEC suit. Recile was subsequently indicted by a federal grand jury. In connection with the grand jury proceedings and in connection with discovery in the SEC suit, time sheets concerning Beckner's representation of Recile were subpoenaed. Beckner testified to the grand jury that he had produced all subpoenaed time sheets. An associate in Beckner's law firm, however, found several of Beckner's time sheets relating to Recile's mortgage notes in an office trash can, and turned them over to the FBI. Another of Beckner's associates informed authorities that Beckner had knowingly aided and abetted Recile's fraudulent practices. Beckner was indicted for wire fraud, obstruction of justice, and perjury. His first trial ended in a hung jury, and a mistrial was declared. In a second trial, a jury found Beckner guilty of four counts of wire fraud and one count of perjury. The jury found Beckner not guilty of the obstruction of justice charge. The district court sentenced Beckner to thirty-seven months in federal prison.

II

A

Beckner argues that the district court erred by denying his motion for extended voir dire examination during the jury selection

-2-

process.  Both Beckner and Recile were the subject of extensive media coverage regarding Place Vendome.  Reports of Beckner's first trial were featured prominently in local newspapers and on local television.  At Beckner's second trial, both Beckner and the Government moved the district court to conduct individualized voir dire of prospective jurors concerning pretrial publicity.  The district court denied both motions, and instead questioned prospective jurors about pretrial publicity as a group.

We review a district court's determination of the scope and method of jury voir dire for abuse of discretion.  FED. R. CRIM. P. 24(a); *United States v. Rodriguez*, 993 F.2d 1170, 1176 (5th Cir. 1993).  The district court's discretion includes the decision whether jurors should be questioned collectively or individually. *United States v. Delval*, 600 F.2d 1098, 1102 (5th Cir. 1979).  We will find an abuse of discretion when there is insufficient questioning to allow defense counsel to exercise a reasonably knowledgeable challenge to unqualified jurors.  *Rodriguez*, 993 F.2d at 1176.

A defendant's right to an impartial jury includes the right to an adequate voir dire to identify unqualified jurors.  *Morgan v. Illinois*, 504 U.S. 719, 729-30, 112 S. Ct. 2222, 2230, 119 L. Ed. 2d 492, 503 (1992).  In *United States v. Davis*, 583 F.2d 190 (5th Cir. 1978), we examined the elements of an adequate voir dire when the jury venire has been exposed to potentially prejudicial pretrial publicity.  Because jurors exposed to pretrial publicity

are in a poor position to determine their own impartiality, we held that district courts must make independent determinations of the impartiality of each juror. *Id.* at 198. Though we refused to establish an inflexible rule, we described an acceptable procedure for district courts to follow when making such a determination: the district court should ask jurors what information they have received, ask responding jurors about the prejudicial effect of such information, and then independently determine whether such information has tainted jurors' impartiality. *Id.* at 197.[1] While examination of each juror out of the presence of the other prospective jurors is sometimes preferable, it is not necessarily required. *Id.* at 196-97.

In *United States v. Gerald*, 624 F.2d 1291 (5th Cir. 1980), *cert. denied*, 450 U.S. 920, 101 S. Ct. 1369, 67 L. Ed. 2d 348 (1981), we refused to reverse a conviction on *Davis* grounds, where the record contained no specific evidence of pretrial publicity.

---

[1] We note that in *Mu'min v. Virginia*, 500 U.S. 415, 111 S. Ct. 1899, 114 L. Ed. 2d 493 (1991), the Supreme Court examined the adequacy of a state trial court voir dire concerning pretrial publicity. The Supreme Court held that the trial court's denial of the defendant's motion to question jurors about the contents of news reports did not violate the defendant's Sixth Amendment right to an impartial jury. *Id.* at 1908. In reaching its holding, the Court noted that it enjoys greater latitude in setting standards for voir dire in federal courts according to its supervisory powers than in setting standards for voir dire in state courts according to the Fourteenth Amendment. *Id.* at 1904. The Supreme Court cited our holding in *Davis* for the proposition that the Fifth Circuit has required content inquiries in pretrial publicity cases "in some circumstances." *Mu'min*, 500 U.S. at 426, 111 S. Ct. at 1905-06. The Court further noted that Federal Circuits, like the Fifth Circuit, that have imposed content-inquiry requirements have done so in the exercise of supervisory powers. *Id.* at 427, 111 S. Ct. at 1906; *id.* at 447 n.6, 111 S. Ct. at 1917 n.6 (Marshall, J., dissenting). Thus, the Supreme Court's holding in *Mu'min* does not abrogate our holding in *Davis* that, where pretrial publicity creates a significant possibility of prejudice, the district court must make an independent determination of the impartiality of jurors. *Davis*, 583 F.2d at 198.

We stated that "defense counsel must see that the record reflects the nature and extent of the publicity so that the appellate court may . . . initially determine whether the publicity was prejudicial." *Gerald*, 624 F.2d at 1298. In *United States v. Hawkins*, 658 F.2d 279 (5th Cir. 1981), we reversed multiple convictions on *Davis* grounds, where the district court refused to question potential jurors individually. We identified the proper *Davis* inquiry as "whether the method of voir dire adopted by the district court is capable of giving reasonable assurances that prejudice would be discovered if present." *Hawkins*, 658 F.2d at 283 (internal quotation marks and citations omitted). Thus, we will reverse a conviction because of pretrial publicity if the defendant can establish (1) that pretrial publicity about the case raised a significant possibility of prejudice, and (2) that the district court's voir dire procedure failed to provide a reasonable assurance that prejudice would be discovered if present. *United States v. Chagra*, 669 F.2d 241, 249-50 (5th Cir.), *cert. denied*, 459 U.S. 846, 103 S. Ct. 102, 74 L. Ed. 2d 92 (1982).[2]

_____

[2] In *United States v. Flores*, 63 F.3d 1342 (5th Cir. 1995), we recently held that the district court did not abuse its discretion by first questioning jurors as a group about the death penalty, and then individually questioning jurors who came forward with answers suggesting bias. We noted that we were unsure whether the defendant also meant to challenge the voir dire on pretrial publicity. *Id.* at 1354 n.9. Nonetheless, we stated that, where the district court's "group questioning . . . elicited a large number of responses and . . . the court followed this up with thorough individual questioning of the responding jurors," there was no abuse of discretion. *Id.* Nothing in *Flores*, however, alters the appropriate standard for determining the adequacy of voir dire questioning on pretrial publicity, as established by *Davis* and its progeny. District courts may use collective questioning to identify jurors for which further individual questioning is necessary. *Chagra*, 669 F.2d at 253 n.15. However, district courts may not, through use of any type of questioning, deflect their responsibility to make an independent determination of the impartiality of

1

We first must determine whether the record in Beckner's case contains sufficient evidence of pretrial publicity to raise a significant possibility of prejudice.[3]  Prior to his second trial, Beckner filed a motion for extended voir dire examination. Attached to the motion, Beckner submitted forty-eight newspaper articles from the local newspaper and a video tape of excerpts from eight local television news broadcasts.  Some of the articles focus exclusively on Sam Recile and the failure of the Place Vendome project.   Most of the submitted articles and news broadcasts, however, focus on Beckner specifically.  Although many are merely

jurors.  *Hawkins*, 658 F.2d at 285.

[3]     We have not previously formulated a standard or list of factors to determine when pretrial publicity creates a significant possibility of prejudice. *Compare Hawkins*, 658 F.2d at 284-85 (finding significant possibility of prejudice from 40 submitted newspaper articles and television news transcripts, many of which highlighted drug-related nature of the charges, speculated about defendant's connection to violent acts, and reported guilty pleas and sentences of other defendants) *with United States v. Colacuracio*, 659 F.2d 684, 689 (5th Cir. 1981) (finding no significant possibility of prejudice from two submitted newspaper articles, one of which connected the defendant to organized crime and prostitution, and one of which labeled the defendant a "vice lord"), *cert. denied*, 455 U.S. 1002, 102 S. Ct. 1635, 71 L. Ed. 2d 869 (1982).  As we have stated in another context, every claim of potential jury bias due to publicity turns on its own facts. *See United States v. Aragon*, 962 F.2d 439, 444 (5th Cir. 1992) (reversing conviction for district court's failure to conduct voir dire concerning mid-trial publicity).  However, cases addressing potential jury bias due to publicity regularly rely on such factors as the amount of the publicity, the time period between the publicity and the trial, the inclusion of inadmissible evidence, reports of guilty pleas of co-defendants, and the inflammatory nature of the publicity. *See, e.g., Salemme v. Ristaino*, 587 F.2d 81, 88 (1st Cir. 1978) (finding no threat of unfair trial where five years passed since publicity); *United States v. Holman*, 680 F.2d 1340, 1348 (11th Cir. 1982) (finding no significant prejudice where article contained only data admissible at trial); *Aragon*, 962 F.2d at 444-46 (finding significant prejudice where article contained defendant's prior convictions); *Davis*, 583 F.2d at 196 (finding significant possibility of prejudice where media coverage included violent backgrounds of defendant "and his confederates").

objective reports of the status of his case, several of the articles and television news broadcasts are more problematic. Newspaper articles connected Beckner to Sam Recile when Recile pleaded guilty to wire fraud charges and again when Recile was sentenced. When a mistrial was declared in Beckner's first trial, the U.S. Attorney was quoted on television and in the newspaper as stating that eleven of twelve jurors were prepared to find Beckner guilty on several counts. The media linked the possibility of a retrial with Beckner's political connections)) whether the impending replacement of the U.S. Attorney who had served under the Bush Administration with the U.S. Attorney nominated by the Clinton Administration would eliminate the possibility of a retrial of Beckner, who himself served as U.S. Attorney under the Carter Administration. Beckner was retried only five months after many of these reports were either published or broadcast. Thus, on this record, we conclude that the pretrial publicity in Beckner's case was sufficient to raise a significant possibility of prejudice.

2

We must next determine whether the district court's voir dire in Beckner's case provided a reasonable assurance that prejudice would be discovered if present. As we have previously stated, "[T]he clear teaching of *Davis* is that, when a significant possibility exists that a juror will be ineligible to serve because of potentially prejudicial publicity, it is the obligation of the *district court* to determine whether that juror can lay aside any

impression or opinion due to the exposure." *Hawkins*, 658 F.2d at 285. Jurors are in a poor position to make determinations as to their own impartiality. *Davis*, 583 F.2d at 197. The district court in Beckner's case devoted great attention to pretrial publicity in its voir dire of prospective jurors. However, the district court did not ask jurors what information they had read, heard, or otherwise received as a result of such publicity. Nor did the district court ask jurors how any such information had affected their attitudes or perceptions of the case. The district court did ask the panel whether anyone had been so affected by pretrial publicity that he or she could not be completely fair and impartial.[4] None of the prospective jurors responded.[5] By allowing jurors to decide their own impartiality, the district court failed to fulfill its obligation under *Davis* to make an *independent*

_____

[4]    The district court inquired:
Does anybody feel that, up to this point in time, they have in any way been affected by any news coverage, so that they could not be absolutely satisfied within themselves that they would be able to give this matter a completely fair and impartial hearing at your hands, in your good hands when you are the members of the jury in this case? Does anybody feel that anything they either have read, seen on the tube, or heard from people talking about it, an article in the paper or a news coverage on the television or whatever, would in any way affect their ability to be completely fair and impartial in hearing and deciding this case? I thank you.
The district court repeated this question in slightly different words several times during the course of the voir dire. For a complete recitation of the relevant excerpts from the transcript of the district court's voir dire, *see* Appendix, attached.

[5]    Beckner objected to the voir dire at a bench conference immediately following the voir dire. Counsel stated, in part, "The one thing we are concerned about, a juror is not qualified or in the position of determining his or her own impartiality, when faced with pretrial publicity exposure. The questions that the Court asked, although going into pretrial publicity, left it up to the individual member of the jury whether or not they had been prejudiced by it. We think *United States versus Davis* specifically mandates the Court to do otherwise. And we incorporate our memos that we filed previously with the Court in our objection."

-8-

determination of the impartiality of each juror.  Thus, we conclude that the district court's voir dire was insufficient to provide a reasonable assurance that prejudice would be discovered if present.[6]

Beckner has demonstrated both that pretrial publicity in his case gave rise to a significant possibility of prejudice and that the district court's voir dire did not afford a reasonable assurance that prejudice would have been discovered if present.  Thus, we hold that the district court abused its discretion by failing to make an independent determination of the impartiality of each juror.

B

Beckner also alleges that the district court erred by not

_____

[6]     We note the similarities between the voir dire inquiry in Beckner's case, *see supra* note 4, and the voir dire inquiries found insufficient in *Davis* and *Hawkins*:
> "Now, all of you have had some exposure in the media to this case.  To what extent have you been exposed to this publicity, this exposure by the media?  Has such publicity affected your ability to render a fair and impartial verdict in this case and has there been any effect on your ability to listen to the evidence and base a verdict solely on the evidence?  And if there has been any impairment or if you have reached any preconceived feeling or notion about what happened or any circumstances about this that would tend to cause you to favor one side or the other in this case, please raise your hand at this time.  I take it that by your silence none of you feel that you would be prejudiced against the defendant and for the Government and vice versa.  All right."

*Davis*, 583 F.2d at 196 n.5.
> "If any of you have heard about this case, or have read about it in the newspaper, or heard it on TV or the radio, or have talked with anyone, which has caused you to form an opinion as to the guilt or innocence of the Defendants, and if that is such an opinion as would affect you if selected as a Juror, may I see your hand?
> . . . .
> I presume then, that none of you know enough about the case or heard enough about it that you feel that it would keep you from being a fair and impartial Juror or would affect or influence your verdict."

*Hawkins*, 658 F.2d at 282.

giving a requested jury instruction on attorney-client confidences, that the record contains insufficient evidence to support the wire fraud convictions, that the record contains insufficient evidence to support the perjury conviction, and that the district court erred in its application of the Sentencing Guidelines. Since we reverse Beckner's conviction because of the district court's insufficient voir dire, we need not reach these issues.

III

Accordingly, we REVERSE Beckner's conviction and REMAND to the district court.

APPENDIX

The relevant portions of the transcript of the district court's

voir dire are as follows:

What I want to get into now a little bit is the affect (sic), if any, that any prior publicity in connection with this matter may have had on any of you all. For indeed, there has been some discussion of this case in the press, in the newspaper, on the tube, I suppose on the radios, though I have no knowledge of that. But it's clear to me that there have been some references as late as today in the Advocate and some references as late as today in the television news programs that this matter was coming on for trial. We would begin jury selection today. Indeed, certain of that-- some of that press coverage goes into some details with respect to prior events that may have taken place in connection with the matter as it involves the U.S. contentions against Mr. Beckner. The purpose of this question is to first ask you all, I want you to think about this carefully as with all the other questions I put to you. Does anybody feel that, up to this point in time, they have in any way been affected by any news coverage, so that they could not be absolutely satisfied within themselves that they would be able to give this matter a completely fair and impartial hearing at your hands, in your good hands when you are the members of the jury in this case? Does anybody feel that anything they either have read, seen on the tube, or heard from people talking about it, an article in the paper or a news coverage on the television or whatever, would in any way affect their ability to be completely fair and impartial in hearing and deciding this case? I thank you.

Does anybody feel that the contentions set forth in the press with respect to the fact that the matter is one that has been dealt with in connection with the Recile trial and, indeed, other trials, would you all feel that in any way that affects your ability as the jury in this case, to make a fair and square determination of the outcome of this case on the facts as you find them to be in the course of this trial?

Does anybody have any trouble limiting their consideration of this case to those circumstances? In other words, what I am trying to be sure of, my friends, that the jury that is picked to ultimately decide this case is not affected by any other series of events, circumstances, outcomes, determinations of guilt or not guilty, as the case may be, have any inability to agree

-11-

with respect to any other proceedings, but will concern themselves solely and only with the trial of this matter in the course of this trial, in this courtroom, under the facts that this jury finds as being the facts to be dealt with in the ultimate decision that only you all can make as to how this case comes down? Does anybody have any trouble with the absolute condition that I will impose, that is built in, essentially, through all of the discussions that I have had with you, that you must concern yourself only with what is developed in the course of this trial as it has to do with your ultimate determination in the course of this trial as to the contentions made by the Government relative to Mr. Beckner? Anybody have any trouble limiting their consideration on that basis?

What will take place, so you will know what I am talking about, is, we will be trying a matter with respect to certain aspects, may have, in some instances, been dealt with in some respects prior to this. But what we are going to be concerned about, my friends, you and I, is the absolute total impartial consideration of the case as it is presented in these next few days that we are together in this courtroom with respect to those facts that are developed in the course of this trial and only that. And barring all other circumstances or other considerations, does anybody have any trouble with our dealing with it in that context?

. . . .

Well, I expect a lot of you, as we review all of this, I don't think in any way a misplaced expectation, I can tell by your experiences that you are following along with what I say and that we are together on it. Does anybody feel that anything that they have read up to now or heard or seen on the tube, will in any way affect their ability to be completely fair and impartial in hearing and deciding this case? Does anybody feel that they have something other than a passing knowledge of the media coverage? Has anybody found themselves, for whatever reason, in some way more heavily influenced by what they read or heard up to now, than would be the normal situation if you were simply coming to work and somebody was asking you about the case? In other words, does anybody feel that they have anything more than the usual expressions from the tube, from the paper, from the radios, et cetera, about this matter or does anybody feel that it has influenced them unduly to where there is some notion on their part as to how the case must ultimately come out or more likely come out because of any press coverage as I discussed? The underlying consideration that all of us must bring, we could ask slightly

different questions about, you know, for another hour. The overriding consideration is fairness. The absolute necessity to be completely fair and impartial in hearing this case, to have the evidence that is adduced in the course of this trial to be the 100% foundation for your ultimate decision as to the outcome of the case and not be affected by anything other than what you, the jury, who is going to decide the case, have heard and determined in the course of the trial. Anybody have any trouble with that at all?