**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 28, 2013

No. 11-31049

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

RENEE GILL PRATT,

Defendant–Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, OWEN, and GRAVES, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Renee Gill Pratt appeals her sentence and conviction of one count of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO)[1] pursuant to 18 U.S.C. § 1962(d). We affirm Pratt's conviction but vacate her sentence and remand for resentencing.

**I**

Pratt, a member of the Louisiana House of Representatives from 1991 to 2002 and a New Orleans city councilmember from 2002 to 2006, was prosecuted in connection with a federal investigation of several Louisiana politicians and

---

[1] 18 U.S.C. §§ 1961-1968.

businesspeople who allegedly abused their positions and misappropriated public funds. The Government accused Pratt of using her political influence and power to further the objectives of a criminal enterprise ("the Enterprise") comprising Pratt, members of a well-known Louisiana family, and various nonprofit entities they controlled. Pratt allegedly conspired with members of the Enterprise to illegally funnel state and federal funds and property to members of the conspiracy for their personal benefit.

Initially, the Government indicted Mose Jefferson, Angela Coleman, and Betty Jefferson ("the Jeffersons") on multiple felony charges including embezzlement, money laundering, mail fraud, and conspiracy to commit the same. As the investigation progressed, the Government obtained a first superseding indictment that added Pratt as a defendant and recast the conspiracy charge as a RICO conspiracy. Pratt was charged only with the RICO conspiracy count and not under any of the substantive counts. Pratt moved to sever, arguing that the indictment alleged only a minor role in the conspiracy and that her defense would be prejudiced by the presentation of evidence concerning her codefendants' substantive crimes. The court denied the motion.

After a second superseding indictment was issued, Betty Jefferson and Angela Coleman pleaded guilty, and the Government obtained a third superseding indictment against only Pratt and Mose Jefferson. Pratt filed a motion to dismiss, arguing that the indictment did not allege facts to support the court's subject matter jurisdiction and failed to allege actual criminal conduct by Pratt. The court denied the motion. Due to Mose Jefferson's health problems, the Government then proceeded to trial against Pratt alone. That trial resulted in a hung jury. In anticipation of a second trial, the Government obtained a fourth superseding indictment, which named Pratt as the only defendant. As a result, this indictment omitted the substantive-crime counts, but retained

No. 11-31049

references to the Jeffersons and details of their conduct as it related to the alleged conspiracy.

Jury selection for Pratt's second trial began with a thirty-page questionnaire sent to each potential juror. Several of the questions concerned pretrial publicity and potential bias. In addition to general questions about media exposure and consumption, potential jurors were specifically asked if they had heard of Pratt, the Jeffersons, or any of several related individuals and entities and, if so, what opinions the potential jurors had formed. The district court struck some potential jurors based on their answers to the questionnaire.

After conducting voir dire of the remaining potential jurors as a group, the court questioned each potential juror individually. At first the district court permitted the attorneys to ask questions directly, but during individual questioning of the fourth potential juror, the court took control. Pratt's lawyer objected to the court's decision and exclaimed that he had "never seen or met a judge who knew how to conduct a voir dire, except to clean up a witness who [was] already tainted." However, the court refused to cede control and admonished Pratt's attorney not to argue further. During the subsequent two days of questioning, the court entertained objections and permitted the parties to request additional questioning of the venire but did not allow either side to question potential jurors directly. At various times during the questioning, Pratt moved to strike jurors for cause, but the court overruled her objections. At the conclusion of the individual questioning, the district court entertained challenges for cause one last time. Pratt challenged only two jurors, and the court overruled both challenges.[2] Both sides then exercised their peremptory strikes, and Pratt used some of her challenges to strike jurors that she had

---

[2] The court also overruled all of the Government's challenges.

No. 11-31049

unsuccessfully challenged for cause. Pratt never moved to dismiss for cause any of the jurors ultimately empaneled.

The Government used five of its eight peremptory strikes to excuse black jurors, leaving only one black juror on the panel. Pratt objected, arguing that the Government's strikes were racially motivated. The Government offered race-neutral reasons for each of the strikes, after which Pratt was given an opportunity to argue that those reasons were pretext for discrimination. The district court denied Pratt's objection, finding the Government's proffered reasons credible. The court then empaneled the jury and two alternates without further objection from either side.

After a 10-day trial, the jury convicted Pratt on the single count of conspiracy to violate RICO. At sentencing, the court calculated a recommended sentencing range under the United States Sentencing Guidelines (the Guidelines) of 78-97 months and sentenced Pratt to 87 months of imprisonment. Pratt appealed and now asserts four points of error: (1) the court failed to question the venire adequately about pretrial publicity, (2) the Government used its peremptory challenges to exclude jurors on the basis of race, (3) the fourth superseding indictment failed to identify sufficiently the pattern of racketeering activity underlying the conspiracy, and (4) the district court improperly calculated the Guidelines sentencing range. We first address the issues pertaining to Pratt's conviction.

**II**

Pratt raises two objections to the manner in which the court conducted voir dire. First, she asserts that the district court failed to question the venire sufficiently about their biases, making it impossible to determine whether the seated jury was impartial. Second, she argues that the court improperly rehabilitated jurors who were clearly biased and therefore erred in not

4

No. 11-31049

dismissing several specific jurors for cause. As a result, Pratt claims she was deprived of effective use of her twelve peremptory challenges.[3]

We review the district court's voir dire procedures for abuse of discretion.[4] The district court has great latitude to conduct voir dire, including the form and scope of questioning.[5] "[O]nly 'when there is insufficient questioning to allow defense counsel to exercise a reasonably knowledgeable challenge to unqualified jurors,'" does the district court abuse its discretion.[6] To demonstrate that questioning about pretrial publicity was inadequate, a defendant must show "(1) that pretrial publicity about the case raised a significant possibility of prejudice, and (2) that the district court's voir dire procedure failed to provide a reasonable assurance that prejudice would be discovered if present."[7] The parties do not dispute that pretrial publicity was substantial and raised a significant possibility of prejudice. The Jeffersons were the subject of significant media attention, as was Pratt herself, much of it negative. The only question is whether the district court's voir dire was sufficient to reveal biased jurors.

We have resisted categorically requiring any specific voir dire procedures or questions, and we give great deference to the trial court's determination of impartiality.[8] It is clear, however, that a court may not rely solely on a juror's

---

[3] The Government was allotted eight strikes and Pratt twelve; both received two more than mandated. *See* FED. R. CRIM. P. 24(b)(2).

[4] *United States v. Bieganowski*, 313 F.3d 264, 272 (5th Cir. 2002) (citing *United States v. Beckner*, 69 F.3d 1290, 1291 (5th Cir. 1995)).

[5] *Id.*; *see Mu'Min v. Virginia*, 500 U.S. 415, 423 (1991) ("[F]ederal judges have been accorded ample discretion in determining how best to conduct the voir dire." (quoting *Rosales-Lopez v. United States*, 451 U.S.182, 189 (1981)) (internal quotation marks omitted)).

[6] *Bieganowski*, 313 F.3d at 272-73 (quoting *Beckner*, 69 F.3d at 1291).

[7] *Id.* at 273 (quoting *Beckner*, 69 F.3d at 1292) (internal quotation marks omitted).

[8] *See Bieganowski*, 313 F.3d at 272-73; *see also Mu'Min*, 500 U.S. at 425-26 (holding that a court need not ask questions about the specific content of media exposure unless "the

assertion of impartiality but instead must conduct a sufficiently probing inquiry to permit the court to reach its own conclusion.[9] For example, in *United States v. Davis*,[10] we held that merely asking potential jurors to raise their hands if they could not be impartial was not adequate voir dire in light of significant pretrial publicity of the defendant's participation in a sensational jail break in Mexico.[11] Other than that single, group question, the district court in *Davis* only gave a general admonishment to the venire that they would be required to decide the case impartially.[12] The court asked no follow-up questions and made no specific inquiries of any individual juror.[13] "Without establishing an inflexible rule" for voir dire, we held that the district court failed to "make sufficient inquiry into the possibility of prejudice" given the circumstances.[14] Our subsequent cases have affirmed that such a perfunctory inquiry is insufficient when there is a reasonable probability of bias,.[15]

---

trial court's failure to ask these questions [would necessarily] render the defendant's trial fundamentally unfair").

[9] *Beckner*, 69 F.3d at 1291 ("[B]ecause jurors exposed to pretrial publicity are in a poor position to determine their own impartiality . . . district courts must make independent determinations of the impartiality of each juror.").

[10] 583 F.2d 190 (5th Cir. 1978).

[11] *Davis*, 583 F.2d at 196.

[12] *Id.*

[13] *Id.*

[14] *Id.* at 198.

[15] *See United States v. Beckner*, 69 F.3d 1290, 1293-94 (5th Cir. 1995) (holding that the district court's failure to make any inquiry into the substance or effects of media exposure was an abuse of discretion and that simply asking the panel as a group whether "anyone . . . could not be completely fair and impartial" was not sufficient); *United States v. Hawkins*, 658 F.2d 279, 285 (5th Cir. Unit A 1981) ("[W]hen the nature of the publicity as a whole raises a significant possibility of prejudice, and a juror acknowledges some exposure to that publicity, more than the abbreviated questioning conducted in *Davis* and in the case sub judice is necessary.").

No. 11-31049

Recently, the Supreme Court closely examined the sufficiency of voir dire concerning pretrial publicity in *Skilling v. United States*.[16] Affirming that "[n]o hard-and-fast formula dictates the necessary depth or breadth of voir dire," the Court considered whether the district court's questioning of potential jurors was sufficient in the high-profile criminal trial of Jeffrey Skilling, the former president of Enron Corporation.[17] The Court held that it was not an abuse of discretion for the district court to question potential jurors unilaterally rather than permitting the lawyers to pose questions.[18] Noting that the district court "did not simply take the venire members who proclaimed their impartiality at their word," the Court concluded that the questioning was adequate to "uncover concealed bias" and gave the court sufficient "face-to-face opportunity to gauge demeanor and credibility."[19] The district court's determinations in *Skilling* were the "culmination of a lengthy process" that included screening questionnaires, individual probing on the question of bias, repeated encouragements of candor, and the opportunity for counsel to ask follow-up questions.[20]

We are convinced that the voir dire in this case was sufficient. Unlike the perfunctory inquiries in *Davis* and similar cases, the district court's questioning here was extensive and probing. The court's procedures were substantially the same as those in *Skilling*. The potential jurors completed an eight-page screening questionnaire that included multiple questions about media exposure and bias. During voir dire, the court questioned all potential jurors individually and out of the presence of the other potential jurors about their ability to be

---

[16] 130 S. Ct. 2896 (2010).

[17] *Skilling*, 130 S. Ct. at 2917; *see id.* 2917-23.

[18] *Id.* at 2918, 2923.

[19] *Id.* at 2922-23.

[20] *Id.* at 2919.

impartial.  The court followed up with additional questions to each potential juror who indicated any possibility of bias.  Furthermore, the court repeatedly admonished potential jurors that they must put aside any preconceived beliefs and decide the case based only on the evidence presented.[21]  Although the court did not allow the lawyers to directly question jurors during the individual questioning, both lawyers were present and could suggest lines of inquiry, request follow-up questions, and make objections.  Like *Skilling*, this case involved allegations of complex financial crimes with substantial media coverage prior to trial and similar risk of bias.[22]  Arguably the risk of bias was much higher in *Skilling*, because the defendant himself was prominently featured in voluminous pretrial media coverage whereas the publicity in this case focused primarily on Pratt's codefendants, the Jeffersons.  In sum, we see no evidence that the district court abused its discretion.

We reject Pratt's contention that only a trial lawyer is capable of asking the sufficiently probing and nuanced questions to uncover bias.  It is well established that voir dire is the district court's responsibility.[23]  Although we have recognized that the participation of counsel for the parties is important, we have never held that the parties have any right to ask questions directly.[24]  To the contrary, the Federal Rules of Criminal Procedure explicitly provide that the

---

[21] *See Skilling*, 130 S. Ct. at 2918 n.21.

[22] *See United States v. Bieganowski*, 313 F.3d 264, 273-74 (5th Cir. 2002) (considering the context of media coverage in evaluating the sufficiency of voir dire).

[23] *See United States v. Cervantes*, 706 F.3d 603, 613 (5th Cir. 2013) ("The trial court has broad discretion to determine who will question potential jurors and what questions will be asked." (quoting *United States v. Rasco*, 123 F.3d 222, 231 (5th Cir. 1997)) (internal quotation marks omitted)); *see also Gonzalez v. United States*, 553 U.S. 242, 250 (2008) ("[T]he presiding judge has significant discretion over the structure of voir dire. The judge may ask questions of the jury pool or . . . allow the attorneys for the parties to do so.").

[24] *See United States v. Ledee*, 549 F.2d 990, 993 (5th Cir. 1977) (noting that the opportunity to submit questions during voir dire aids counsel in uncovering bias).

court may conduct the questioning of the venire itself and require the court only to allow counsel to "submit further questions that the court may ask if it considers them proper."[25] Furthermore, we have repeatedly held that the presiding judge has broad discretion in determining the scope of questioning.[26] Pratt's counsel was present for voir dire and was able to and did submit questions. The court complied with the Rules and did not abuse its discretion.

We also find no merit in Pratt's argument that she was improperly forced to use her peremptory challenges to strike potentially biased jurors. Peremptory challenges are provided for by the Federal Rules of Criminal Procedure and are not a part of the defendant's constitutional right to a trial by an impartial jury.[27] As a result, "a defendant's exercise of peremptory challenges . . . is not impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause."[28] A defendant who believes that a juror should be struck for cause faces the "hard choice" of using a peremptory challenge or accepting the potentially biased juror and arguing a Sixth Amendment violation on appeal.[29] If the defendant chooses the former, then there is no error unless "the trial court deliberately misapplied the law in order to force the defendant[] to use a peremptory challenge" or the loss of the

---

[25] FED. R. CRIM. P. 24(a)(2)(B).

[26] *See, e.g.*, *Cervantes*, 706 F.3d at 613; *United States v. Rodriguez*, 993 F.2d 1170, 1176 (5th Cir. 1993) (holding that the court abuses its discretion only "when there is insufficient questioning to produce some basis for defense counsel to exercise a reasonably knowledgeable right of challenge").

[27] *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000) (explaining that peremptory challenges "are auxiliary; unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension"); FED R. CRIM. P. 24(b).

[28] *Martinez-Salazar*, 528 U.S. at 317.

[29] *Id.* at 315.

peremptory challenge "result[ed] in the seating of any juror who should have been dismissed for cause."[30]  Here, Pratt does not argue that the court deliberately misapplied the law, and there is no indication that any of the empaneled jurors was biased.

Even assuming that the court erred in denying any of Pratt's motions to remove jurors for cause, Pratt concedes that she made the hard choice to use her peremptory strikes to remove those biased jurors.  During voir dire, Pratt did not raise objections to any of the jurors who were actually empaneled although she did move to disqualify several other potential jurors.  When asked whether the jury and the alternates were acceptable Pratt's lawyer replied "Yes, Your Honor."  Whether impartiality in the jury is achieved through disqualification by the court or through the use of peremptory strikes, the absence of biased jurors from the panel is all the Sixth Amendment requires.

In her reply brief, Pratt appears to suggest that a single juror, Pitman, should not have been seated because of bias.  In his initial questionnaire, Pitman stated that he thought the Jeffersons were "corrupt" and "generally believe[d] them to be guilty."  However, when asked to explain these statements during voir dire, Pitman said he had "thought about that question since the questionnaire" and concluded that he could judge Pratt on the evidence alone.  Furthermore, because Pitman was questioned before the court took over the entire process, Pratt's lawyer was able to question Pitman extensively.  Pratt's lawyer pressed Pitman repeatedly about bias, and Pitman's answers do not suggest any hedging on his part.  Tellingly, Pratt never moved to strike Pitman for cause at any point during jury selection and raised no objection to his selection as the first member of the panel.

---

[30] *United States v. Sanchez-Hernandez*, 507 F.3d 826, 830 (5th Cir. 2007) (citing *Martinez-Salazar*, 528 U.S. at 316).

No. 11-31049

Nor does our own review of the record compel the conclusion that the district court committed manifest abuse of discretion in empaneling the twelve jurors and two alternates who finally decided this case.[31] To be sure, several jurors reported exposure to pretrial publicity, and some even admitted to forming negative opinions of the Jeffersons and their associates, potentially including Pratt. Nevertheless, we see nothing in these comments to demonstrate that the jurors would have been unable to perform their duties.[32] The district court carefully questioned each juror about media exposure and, where appropriate, asked probing questions to ferret out possible bias. All jurors who had expressed any potential bias were questioned in detail and affirmatively stated that they could set aside their preconceptions and apply the law as instructed. We are mindful that the district court was present to observe the demeanor and tone of the jurors as they answered and find no reason to second guess the court's decision.[33]

## III

Pratt next challenges the Government's use of its peremptory strikes, arguing that the strikes were racially motivated in violation of *Batson v. Kentucky*.[34] We review for clear error the district court's determination of

---

[31] *United States v. Snarr*, 704 F.3d 368, 386 (5th Cir. 2013) ("The appellate court reviews the district court's ruling on jury impartiality for 'manifest abuse of discretion.'" (quoting *United States v. Wharton*, 320 F.3d 526, 535 (5th Cir. 2003))).

[32] *Id.* at 386 (holding that dismissal for cause is appropriate only if "the prospective juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath" (quoting *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000)) (internal quotation marks omitted)).

[33] *Skilling v. United States*, 130 S. Ct. 2896, 2923 (2010) (noting that, when reviewing a district court's decision to seat a juror over an objection of bias, "the deference due to district courts is at its pinnacle").

[34] 476 U.S. 79 (1986).

11

whether the use of peremptory strikes was racially motivated.[35] To succeed in a *Batson* challenge, Pratt must first establish a prima facie case that the Government exercised its peremptory challenges on the basis of race.[36] The burden then shifts to the Government to present a race-neutral explanation for each strike.[37] Once the Government presents race-neutral reasons, the burden shifts back to Pratt to prove "purposeful discrimination."[38]

We are concerned only with the third step of the *Batson* analysis. The parties do not dispute that Pratt established a prima facie case of purposeful discrimination, and in any event, the Government's offer of race-neutral reasons removes the question from our review.[39] Nor does Pratt argue that the Government failed to present at least one race-neutral reason for each strike.[40] Pratt's sole assertion is that the Government's nondiscriminatory reasons lack credibility in light of the stark effect of the Government's strikes on the composition of the jury. The Government struck five of the six potential jurors who were black. In doing so, the Government used more than half of its allotted peremptory strikes on black jurors, and only one juror of the twelve-member jury that ultimately convicted Pratt was black.

---

[35] *United States v. Williamson*, 533 F.3d 269, 274 (5th Cir. 2008).

[36] *Smith v. Cain*, 708 F.3d 628, 636 (5th Cir. 2013).

[37] *Id.*

[38] *Id.*

[39] *United States v. Williams*, 610 F.3d 271, 280 (5th Cir. 2010) ("Where, as here, the prosecutor tenders a race-neutral explanation for his peremptory strikes, the question of Defendant's prima facie case is rendered moot." (quoting *United States v. Williams*, 264 F.3d 561, 571 (5th Cir. 2001)) (internal quotation mark omitted)).

[40] *See Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam) ("At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (alteration in original) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion))).

No. 11-31049

When challenged, the Government offered reasons for each of the five black jurors it struck—Graves, Blanchard, Allen, Williamson, and Cosse. The Government claimed that juror Graves had expressed a positive view of Pratt as someone he admires and that he had communicated with his stepfather about "people who work in city hall," potentially including Pratt. The Government also claimed that Graves gave a "bizarre nonresponsive answer" when asked about possible prior contact with Pratt. Next, the Government claimed that juror Blanchard was likely to have an affinity for Pratt, given that both had been employees of the New Orleans Parish School Board. Like Blanchard, Pratt had been a teacher. The Government also claimed that Blanchard made an "um-hump" noise when the deputy chief of the Criminal Division introduced himself, which the Government interpreted as negative. The Government asserted that juror Allen appeared to have a negative attitude concerning jury service based on body language and had some child-care issues that the Government felt exacerbated his attitude. The Government then noted that juror Williamson was involved in a dispute with the IRS and had previously employed an attorney who the prosecutor knew had some "interaction with the federal government" that the prosecutor could not divulge but suggested was negative. Finally, the Government claimed that juror Cosse made statements suggesting that he was dissatisfied with the way the criminal justice system had treated his brother who was sentenced to life in prison for a shooting that his brother claimed was in self-defense.

Because the district court's decision rests primarily an evaluation of the prosecutor's credibility,[41] we will not disturb the district courts ruling "in the

---

[41] *United States v. Turner*, 674 F.3d 420, 436 (5th Cir.) ("Given the subjective nature of jury selection, the district court's determination is likely to be based 'largely on the court's evaluation of the credibility of counsel's explanation.'" (quoting *United States v. Perkins*, 105 F.3d 976, 978 (5th Cir. 1997))), *cert. denied*, 133 S. Ct. 302 (2012).

absence of exceptional circumstances."[42]    "[T]he district court ha[s] the advantage[] of observing the voir dire . . . and being able to consider the demeanor of the prosecutor as he [makes] his explanation."[43]  Circumstances that call the Government's credibility into question include the failure to engage in meaningful questioning regarding the issue on which its allegedly nondiscriminatory reason is based and failure to strike otherwise similarly-situated jurors of a different race.[44] "[I]mplausible or fantastical" reasons are also evidence of pretext.[45]

Pratt first points to three nonblack jurors whom the Government did not strike and argues that they were similarly situated to Cosse and Blanchard.[46] Like Cosse, jurors Baum and Federico both had potentially negative views of law enforcement based on prior experiences with the criminal justice system. Baum's two stepsons had been convicted of passing bad checks and a state drug offense, respectively, and Federico had been arrested for petty theft in 1986. Juror Bourgeois had the same work background as Blanchard.  We are not persuaded by these comparisons.

Although Baum's two stepsons had been convicted of crimes and Federico had been arrested, neither juror expressed any dissatisfaction with the police or

---

[42] *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (quoting *Hernandez*, 500 U.S. at 366).

[43] *Turner*, 674 F.3d at 436.

[44] *Reed v. Quarterman*, 555 F.3d 364, 376 (5th Cir. 2009) ("The State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination." (citing *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005))); *id.* ("If the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects." (citing *Miller-El*, 545 U.S. at 241)).

[45] *Id.*

[46] Pratt does not provide any comparative examples regarding Graves, Allen, or Williamson and our review of the record revealed none.

the criminal justice system and both stated that their respective experiences would not affect their ability to serve on the jury. In contrast, Cosse made statements that plausibly suggested animosity towards the criminal justice system. It is true that the Government did not seek to have the court ask any follow-up questions, but the differences are sufficient to explain the Government's choice to strike Cosse but not Baum and Federico. Pratt's comparison of Bourgeois to Blanchard is similarly unconvincing. Although Bourgeois did have a career in education, she was employed by the Archdiocese of New Orleans, not the New Orleans Parish School Board. Only Blanchard was employed by the same organization as Pratt. The Government had a plausible reason for distinguishing between the two, and we find no justification for reversing the district court's conclusion that the Government's explanation was credible.

Pratt also implicitly argues that the Government's race-neutral reasons are implausible because they are unsupported by the evidence. However, other than repeatedly expressing disbelief that there could be *any* nonbiased explanation for striking five of the six black jurors, Pratt does not offer specific arguments as to why any of the Government's stated reasons were implausible or fantastical and merely argues a different interpretation of the record. Pratt's argument boils down to an assertion that the Government should not be believed because the Government struck five of the six African-American jurors and that "[h]owever plausible or implausible the explanations were here, the numbers do not lie."[47] Although it is true that the raw numbers are a factor to be considered,

---

[47] Pratt also repeatedly points out that her lawyer requested a ten-minute break to review his notes in order to rebut the Government's race-neutral reasons for striking the jurors. Although she implies that the court's refusal to grant the brief recess constituted an error, she cites no authority to support that implication and makes no argument as to why the lack of a break at the time would affect her argument on appeal. Furthermore, Pratt neglects to acknowledge that the court granted a five-minute break immediately after her lawyer first indicated the intention to raise a *Batson* challenge.

No. 11-31049

Pratt cites no case in which this court has held that a district court committed clear error in crediting the prosecutor's race-neutral reasons based solely on such evidence. Because Pratt offers no support for her contention that the Government's reasons are "implausible or fantastical," this argument fails as well.

## IV

We next address Pratt's argument that the fourth superseding indictment charging her was constitutionally deficient because it "omitted all references to specific acts of racketeering activity," leaving only "generic references to the mail fraud and money laundering statutes." Pratt complains that it is impossible to determine the pattern of racketeering activity that she was charged with conspiring to commit, and therefore she was unable to mount an effective defense and is not protected from double jeopardy.

We review the sufficiency of an indictment de novo.[48] To pass constitutional muster, an indictment must "allege[] every element of the crime charged and in such a way as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding."[49] Although "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself," the indictment must also "be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense."[50]

---

[48] *United States v. Ratcliff*, 488 F.3d 639, 643 (5th Cir. 2007).

[49] *Id.* (quoting *United States v. Bieganowski*, 313 F.3d 264, 285 (5th Cir. 2002)) (internal quotation marks omitted).

[50] *Hamling v. United States*, 418 U.S. 87, 117 (1974).

No. 11-31049

Pratt was charged under 18 U.S.C. § 1962(d) with conspiring to violate a substantive RICO provision, § 1962(c).[51]  The elements of a conspiracy under § 1962(d) are simply "(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the *overall objective* of the RICO offense."[52]  The defendant need not be one of the people who agreed to commit the substantive offense.[53]  Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[54]

The 35-page fourth superseding indictment charging Pratt was constitutionally sufficient.  It "alleges every element of the crime charged" using language that tracks the relevant statutory provisions and includes "a statement of the facts and circumstances" that constitute conspiracy to conduct the affairs of the Enterprise, members of which engaged in a "pattern of racketeering activity."[55]  It alleges the existence of an enterprise comprising Pratt, the

---

[51] 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [§ 1962].").

[52] *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005) (emphasis added) (quoting *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998)) (internal quotation marks omitted).

[53] *Id.* at 296.

[54] 18 U.S.C. § 1962(c).

[55] A "'pattern of racketeering activity' requires at least two acts of racketeering activity" that occur within ten years of each other.  18 U.S.C. § 1961(5).  An act of racketeering activity is defined in part as any act that is indictable under enumerated provisions of the criminal code.  *Id.* § 1961(1)(B).  In this case, the indictment alleges that the "pattern of racketeering activity" consisted of multiple, specific acts of mail fraud, in violation of 18 U.S.C. § 1341, and of money laundering, in violation of § 1956.  In order to constitute a pattern, the predicating acts must also be connected in a way that shows a "threat of continuing activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  The activities alleged in this case meet this standard.  *See id.* 239-41.

17

No. 11-31049

Jeffersons, and related nonprofit organizations whose purpose "was to exercise and preserve power over and within the government of the State of Louisiana, the City of New Orleans, Orleans Parish, and elsewhere, for the financial and political benefit of [the Enterprise]." It further alleges that Pratt (along with the Jeffersons and "others known . . . and unknown") fraudulently funneled state and federal grant money to nonprofit entities they controlled; established, maintained, and controlled bank accounts to further the scheme; and maintained false accounts and submitted falsified paperwork in connection with the scheme.

Contrary to Pratt's claim, the indictment need not contain formal charges of the underlying racketeering activities or articulate the evidence that will be used to prove the allegations.[56]  The Constitution requires only enough specificity to allow the defendant to defend against the allegations, and the indictment meets that standard. The indictment identifies the people, nonprofit entities, government programs, funds, and bank accounts involved in specific acts of money laundering and mail fraud. It describes in detail thirteen specific instances of misappropriation of funds or resources undertaken by the criminal Enterprise, including factual details that, if proven, would constitute mail fraud and money laundering. Finally, the indictment contains numerous allegations of conduct by Pratt that demonstrate that she agreed to the objective of the Enterprise, including her relationship with the Jeffersons, efforts to steer money to the Enterprise, and receipt of benefits from the misappropriated funds. In sum, the indictment more than adequately alleges factual circumstances

---

[56] *See United States v. Sutherland*, 656 F.2d 1181, 1197 & n.12 (5th Cir. Unit A 1981) (holding that a RICO conspiracy indictment was sufficient although it did not identify specific dates, locations, or additional details besides the participants and an outline of the alleged bribery scheme).

No. 11-31049

sufficient to prove that two or more people agreed to violate RICO and that Pratt knew of and agreed to the overall objective of the RICO offense.[57]

For the same reasons, the indictment is sufficient to protect Pratt from a second prosecution for the same crime. The Double Jeopardy Clause of the Constitution "protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense."[58] Pratt presumably fears a second prosecution for precisely the same crime—conspiracy to violate RICO under § 1962(d)—based on the same underlying racketeering activities.[59]

It is important to clarify that Pratt does not challenge the sufficiency of the evidence used to convict her. In other words, she does not argue that there was insufficient evidence of a pattern of racketeering activity. Instead she argues that it is impossible to determine on what conduct the jury based its verdict. In other words, Pratt argues that the indictment impermissibly alleged more than one pattern of racketeering activity. Pratt misunderstands the nature of the indictment's role in protecting her against double jeopardy.

As discussed above, the indictment lays out a detailed description of conduct that, if proved, demonstrates that (1) two or more persons agreed to engage in a pattern of racketeering activity and (2) Pratt agreed to further the objective of that pattern. Having been convicted, Pratt is protected by the Constitution from a second prosecution for the same crime based on the same

---

[57] *See Delgado*, 401 F.3d at 296.

[58] *United States v. Phillips*, 664 F.2d 971, 1005 (5th Cir. Unit B 1981).

[59] To the extent Pratt's argument contemplates a future prosecution for a charge other than § 1962(d), it is unlikely she would be protected by double jeopardy in any event. We have held that separate prosecutions for conspiracy to violate RICO and for substantive RICO violations based on the same underlying racketeering activities do not violate the Double Jeopardy Clause. *United States v. Martino*, 648 F.2d 367, 383 (5th Cir. 1981). Nor is successive prosecution in different proceedings for separate crimes based on the same conduct prohibited as a general matter. *United States v. Dixon*, 509 U.S. 688, 705 (1995).

No. 11-31049

factual allegations. That the jury could have found the existence of a pattern of racketeering activity based on some or all of the indictment's factual allegations is of no moment. An indictment is not constitutionally deficient simply because it includes *more* factual allegations than are required to prove every element of the crime charged.[60] There is no merit in Pratt's assertion that she would be unable to raise a Double Jeopardy argument were she ever prosecuted a second time for conspiracy to violate RICO predicated on that same conduct alleged in the indictment.

V

Pratt challenges her sentence. We first note that this case comes to us in an unusual procedural posture. Two types of racketeering activity in violation of 28 U.S.C. § 1962 were alleged—mail fraud and money laundering. The district court calculated the sentencing guidelines range of imprisonment based on money laundering. As we will discuss below, it appears that the sentencing guidelines range should have been based on mail fraud. Pratt has not, however, argued in her brief that the district court erred in using a money laundering offense to calculate the applicable Guidelines range. She has accordingly waived[61] any contention that the district court erred in using a money laundering offense rather than a mail fraud offense in calculating the advisory sentencing guidelines range. Nevertheless, in order to determine if there was

---

[60] *See United States v. Mauskar*, 557 F.3d 219, 225 (5th Cir. 2009) ("The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for [t]he conspiracy is the crime, and that is one, however diverse its objects." (alteration in original) (quoting *United States v. Cooper*, 966 F.2d 936, 939 (5th Cir. 1992)) (internal quotation marks omitted)); *see also United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006) ("As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." (quoting *United States v. Miller*, 471 U.S. 130, 136 (1985))).

[61] *See* FED. R. APP. P. 28(a)(9)(A).

plain error, we will consider the highest range that the Government contends was the correctly calculated range, as we explain further below.

Sentencing for a conviction under 28 U.S.C. § 1962 is addressed by Guidelines section 2E1.1.[62] Because a RICO offense necessarily involves conduct by someone, although not necessarily the defendant, that would itself be a separate offense (i.e. the "underlying racketeering activity"), section 2E1.1 mandates that the district court select a base offense level that is the greater of 19 or the highest calculated offense level applicable to the offense(s) corresponding to the underlying racketeering activity.[63]  If the underlying racketeering activity comprises more than one offense, each should be treated as a separate count of conviction for the purposes of calculating the offense level.[64] "The racketeering act that yields the greatest offense level is [then] used to determine the guideline range."[65]  In other words, section 2E1.1 requires the district court to calculate independently the total offense level of each separate underlying offense and then select whichever is greatest (or 19, if that number is greater).[66]

Unlike most other sections in Chapter Two, section 2E1.1 of the Guidelines does not provide for adjustments based on special offense characteristics, presumably because the district court will have already calculated the special

---

[62] U.S. SENTENCING GUIDELINES MANUAL § 2E1.1.

[63] *Id.*

[64] *Id.* § 2E1.1 cmt. n.1.

[65] *United States v. Posada-Rios*, 158 F.3d 832, 880 (5th Cir. 1998); *see* U.S. SENTENCING GUIDELINES MANUAL § 2E1.1 cmt. n.1.

[66] *See Posada-Rios*, 158 F.3d at 880-81 (holding that the district court's application of the total offense level of the underlying racketeering activity, murder, was proper under section 2E1.1); *see also United States v. Mouzone*, 687 F.3d 207, 220 (4th Cir. 2012) (affirming the district court's calculation of the underlying racketeering activity's total offense level for the purposes of section 2E1.1).

offense characteristics applicable to the offense constituting the underlying racketeering activity.[67]  Convictions for mail fraud and money laundering—the two underlying racketeering activities alleged in this case—are sentenced under sections 2B1.1 and 2S1.1, respectively.

Although the Presentencing Report (PSR) calculated an advisory sentencing range of 70 to 87 months of imprisonment based on mail fraud and enhancements that are applicable in mail fraud cases, and recommended a sentence of 70 months, the district court concluded that money laundering, not mail fraud, was the proper underlying racketeering activity for the purposes of calculating the Guidelines range under section 2E1.1.  The court observed that money laundering has a base offense level of 8 and mail fraud has a base offense level of 7 and held that it was obligated to select the higher number.  The court then applied the enhancements that the PSR had calculated for the mail fraud offense, which resulted in a total offense level of 28 and a sentencing range of 78 to 97 months.  The court then sentenced Pratt to 87 months, which it described as "a mid-level sentence, perhaps to some extent to the high level."

In her appeal, Pratt contends that the district court erred by applying a two-level enhancement pursuant to Guidelines section 2B1.1(b)(8)(A)[68] and that the court miscalculated the amount of "laundered funds" in determining the base offense level for money laundering pursuant to section 2S1.1(a)(2).  The guideline applicable to money laundering, section 2S1.1, directs the court to

---

[67] *Compare* U.S. SENTENCING GUIDELINES MANUAL § 2E1.1 *with id.* § 2B1.1(b) (articulating the special offense characteristics applicable to crimes of theft), *and id.* § 2S1.1(b) (articulating the special offense characteristics applicable to crimes of money laundering).

[68] U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(b)(8), which provides:

(8) If (A) the defendant was convicted of a Federal health care offense involving a Government health care program; and (B) the loss under subsection (b)(1) to the Government health care program was (i) more than $1,000,000, increase by **2** levels; (ii) more than $7,000,000, increase by **3** levels; or (iii) more than $20,000,000, increase by **4** levels.

calculate the base offense level as "8 plus the number of offense levels from the table in section 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the *value of the laundered funds*."[69] "'Laundered funds' means the property, funds, or monetary instrument *involved in* the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. [§] 1956 or 1957."[70] However, the district court did not determine the value of the laundered funds by calculating the amount "involved in the transaction(s)" that constituted money laundering. Instead, the district court calculated the amount of "loss" based on the value of all of the goods and services misappropriated, and used that amount to determine the enhancement by reference to the table in section 2B1.1. Although that would be the proper method for applying the table to a crime of *theft* under section 2B1.1 (such as mail fraud), it does not accord with the instructions in section 2S1.1, which require the district court to determine the amount of funds actually laundered. The court also erred in applying the two-level enhancement under section 2B1.1(b)(8)(A). This enhancement is found under special offense characteristics in section 2B1.1 and is not applicable to a crime that falls under section 2S1.1.

At the sentencing hearing in the district court, Pratt did not object to the section 2B1.1(b)(8)(A) enhancement or the implicit determination that the amount of "laundered funds" equaled the amount of loss. The Government contends, and we agree, that our review of these issues is for plain error. Under that standard of review, we will reverse a sentence only "(1) if there was error, (2) if it was plain, (3) if the error affects substantial rights, and (4) if allowing that error to stand seriously affects the fairness, integrity, or public reputation

---

[69] U.S. SENTENCING GUIDELINES MANUAL § 2S1.1(a)(2) (emphasis added).

[70] *Id.* § 2S1.1 cmt. n.1 (emphasis added).

of judicial proceedings."[71]  A misapplication of the unambiguous instructions of the Guidelines is error that was plain.[72]  Therefore, relief depends on whether the error affected Pratt's substantial rights and seriously affects the fairness, integrity, or public reputation of judicial proceedings.

The Government asserts that if the district court had correctly calculated the advisory Guidelines range based on mail fraud, rather than money laundering, the advisory Guidelines range would have been 70 to 87 months of imprisonment.  Since the 87-months' sentence would still be within that range, the Government argues that Pratt has not demonstrated plain error.  An error in the Guidelines calculation affects a defendant's substantial rights only if there is "a reasonable probability that, but for the district court's misapplication of the Guidelines, he would have received a lesser sentence."[73]  A reasonable probability of a lesser sentence is presumed when "the incorrect range is significantly higher than the true Guidelines range, and . . . the defendant is sentenced within the incorrect range."[74]  However, "when the correct and incorrect ranges overlap and the defendant is sentenced within the overlap, 'we do not assume, in the absence of additional evidence, that the sentence affects a defendant's substantial rights.'"[75]

There is "additional evidence" that Pratt's substantial rights were affected. The transcript of the sentencing hearing reflects that the district court chose a sentence of 87 months of imprisonment because it was within what the district

---

[71] *United States v. Alvarado*, 691 F.3d 592, 598 (5th Cir. 2012).

[72] *See United States v. Olano*, 507 U.S. 725, 732-33 (1993) ("Deviation from a legal rule is 'error.'"); *id.* at 734 ("'Plain' is synonymous with 'clear' or . . . 'obvious.'").

[73] *United States v. Mudekunye*, 646 F.3d 281, 289 (5th Cir. 2011) (per curiam) (citing *United States v. Blocker*, 612 F.3d 413, 416-17 (5th Cir. 2010)).

[74] *Id.*

[75] *Id.* at 290 (emphasis omitted) (quoting *Blocker*, 612 F.3d at 416).

thought was the correctly calculated advisory guidelines range.  The district court explained to the defendant that he felt that it was appropriate to apply the guidelines and not a variance or a non-Guidelines sentence.  The district court also stated on the record that it was choosing a sentence within the middle of the Guidelines range as the appropriate sentence, indicating that the Guidelines range calculated by the district court was a primary factor in the selection of the 87-months' sentence as within a range of 78-97 months.  By contrast, the 87-months' sentence is the highest sentence under a range of 70 to 87 months' of imprisonment, which is the highest range that the Government says applies.  A middle-of-the-Guidelines sentence under a 70 to 87 months' range would be approximately 78 to 79 months, which is 8 to 9 months shorter than the prison term selected by the district court.  Moreover, we cannot say that a range of 70 to 87 months is the correctly calculated range based on the record before us.  There may be issues raised when mail fraud, rather than money laundering, is used as the basis for calculating the Guidelines range that might result in a lower range than 70 to 87 months.

As discussed above, section 2E1.1 instructs the sentencing court to select a base offense level from the greater of 19 or the highest offense level of the underlying racketeering offenses.  The PSR started with this base offense level and then applied a 16-level enhancement under section 2B1.1(a) based on a calculated loss of over $1 million, a 2-level enhancement under section 2B1.1(b)(8)(A) because Pratt "misrepresented that she was acting on behalf of a charitable, religious, or political organization or government agency," and a 2-level enhancement because Pratt "abused a position of public or private trust" pursuant to § 3B1.3.  The resulting a total offense level of 27 resulted in a sentencing range of 70 to 87 months, and the PSR recommended a sentence of 70 months.  We are not in a position to retrace all of the steps required to

No. 11-31049

determine if the PSR correctly calculated the applicable sentencing range.

*     *     *

Pratt's conviction is AFFIRMED. The sentence is VACATED and REMANDED for further proceedings.